## COMSTOCK, Respondent, v. FLOWER, Appellant.

**St. Louis Court of Appeals, December 13, 1904.**

1. **CHAMPERTY: Attorney And Client.** In this State an agreement by an attorney to pay all or some portion of the court costs to accrue in a suit which he is employed to prosecute, is champertous.

2. ——: ——. Where an attorney agreed with an importer to conduct a contest before the General Board of Appraisers for the recovery of excessive duties, stipulating that the importer should incur no expense beyond the payment of one-half of the amount recovered as a compensation to the attorney, the contract was champertous.

3. ——: **Pleading: Affirmative Defense.** The defense that a contract sued on is voidable for the reason that it is champertous, is an affirmative defense and must be pleaded in order to be available.

4. **CONTRACT: Interpretation by Parties.** A contract which is ambiguous in its terms may be interpreted by the construction which the parties thereto have placed upon it.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

AFFIRMED.

*Klene & Welsh* for appellant.

(1) The contract sued on and sought to be enforced is infected with champerty. This is disclosed on the face of the petition. The judgment should therefore be reversed. Million v. Ohnsorg, 10 Mo. App. 432; Euneau v. Rieger, 150 Mo. 659; Duke v. Harper, 66 Mo. 51; Bick v. Overfelt, 88 Mo. App. 139; Pike v. Martindale, 91 Mo. 268; 1 S. W. 858; Bent v. Priest, 86 Mo. 475. (2) The contract being ambiguous, it was for the jury to find the intention of the parties. The court re-

fused to submit this question to the jury, and erred in so refusing. For this error, the judgment should be reversed, and cause remanded, if not reversed for other reasons. Prim v. Haren, 27 Mo. 205; Mathews v. Danahy, 26 Mo. App. 660; Soap Works v. Sayers, 55 Mo. App. 15; Mantz v. Maguire, 52 Mo. App. 146; Deuthman v. Kilpatrick, 46 Mo. App. 627.

*Everett W. Pattison* for respondent.

The first point made by appellant is that the contract sued on is infected by champerty. (1) It is a sufficient answer to this contention of appellant that he did not plead the defense, and could not, therefore, raise it, either in the trial court or here. Moore v. Ringo, 86 Mo. 468. (2) The agreement, the obligation, to pay the costs and expenses, or some part of them, is, under the Missouri decisions, an essential element of champerty. Duke v. Harper, 66 Mo. 51; McIntire v. Thompson, 10 Fed. 532; Allard v. Lamerande, 29 Wis. 502. (3) The rule as to champerty does not apply to proceedings against the government itself, or to proceedings before boards organized for the hearing and determination of claims. Manning v. Sprague, 148 Mass. 18, 12 Am. St. 508; Sedgwick v. Stanton, 14 N. Y. 289; Manning v. Perkins, 85 Maine 172; Millard v. Richland County, 13 Ill. App. 527. And it is so held by the United States courts: Burbridge v. Fackler, 2 MacArth. (D. C.) 407; In re Paschal, 10 Wall. 483, 19 L. Ed. 992; Wylie v. Cox, 15 How. 415, 14 L. Ed. 753; Burke v. Child, 21 Wall. 441, 22 L. Ed. 623; Stanton v. Embry, 3 Otto 548, 23 L. Ed. 983; Taylor v. Bemis, 110 U. S. 42, 28 L. Ed. 64; Bachman v. Lawson, 109 U. S. 659, 27 L. Ed. 1067.

STATEMENT.

This suit is for breach of contract. The contract is made up of and is to be interpreted by the following documents: First the following letter:

"December 13th, 1901.
"Messrs. Walter L. Flower & Co.,
  "Chemical Building, St. Louis, Mo.
"Dear Sirs:
    "I am conducting a contest before a board of appraisers in behalf of a number of importers of copper flexible tubing against the assessment of duty upon the same at 45 per cent. Mr. Moris Ansell, representing the English manufacturer, is now in this country, and I have availed myself of his testimony in support of the contests. He has given me your name together with several others, as being interested as importers of this tubing, and has suggested that you would probably be glad to join your interests to those of the other importers who have placed theirs in my hands for this contest.

    "You are probably aware that the same question arose in a San Francisco case and was decided adversely to the importers in the summer of 1900. I believe notwithstanding that there is quite sufficient chance of recovery, where protests are properly filed and prosecuted to warrant my conducting the contest on the customary contingent basis of a half interest in the amount eventually recovered—the importers to incur no expense in any case beyond the said contingent half interest in the amount eventually recovered, the importers to incur no expense in any case beyond said contingent half interest, even though an adverse decision by the board may require further prosecution in the courts.

    "If you have any entries of these goods which are not yet liquidated, or which have been liquidated within a few days, or if you expect to make any entries, I shall be glad to have you sign the enclosed contract covering the issue and at the same time to send me immediate notice of any such entries. If you have lodged any protests yourself, I will arrange to control them in your behalf.                    Very truly yours,
                "Albert Comstock."

Second, the answer to the above letter:

"St. Louis, Dec. 20, 1901.

"Mr. Albert Comstock,

"56 Pine Street,

"New York City.

"Dear Sir:

"Your favor of the 13th has not been answered earlier on account of the writer's absence from the city, and we attach our signature to the agreement, and return the same herewith, accept all the terms as outlined in this agreement and your letter of the 13th.

"We at present have no entries in the Custom House, or have we had any for a few days past, but will be advised of those that come along in the future.

"Yours very truly,

"WALTER L. FLOWER & CO.

"WALTER L. FLOWER."

Third, the following formal contract:

"In consideration of the information, advice and services of Albert Comstock of 56 Pine street, New York City, in the matters herinafter referred to, we, the undersigned, hereby respectively retain said Albert Comstock, as our attorney, and authorize him to act as our attorney and agent, for the recovery and collection of excessive customs duties charged on all importations of flexible metallic tubing, made by us for our respective interests. We hereby severally agree to pay the said Albert Comstock fifty per cent of each and every amount recovered by us respectively, out of such excessive duties whether recovered by repayments to us of a sum previously paid by us, or by our being credited on the official records with an amount previously charged against us. We also agree to give said Albert Comstock timely and sufficient notice of each such importation, and of all official transactions connected therewith. But we are not to be liable hereunder for any expenses which may be incurred by said Albert

Comstock in pursuance of this agreement, nor for any sums whatever, except in the event of a recovery as stated above, and then only to the extent above named.

"This agreement, with the terms of compensation herein provided, is intended to recover and include all importations as aforesaid which have already been entered at the custom house, and also all which may hereafter be entered, before final decisions are reached concerning the respective contentions covered hereby; such final decisions meaning either the abandonment of the contention by our said attorney, or the official recognition by the collector of the port of the correctness of said contention.

"In witness whereof, we have hereunto set our hands respectively on the dates named in connection therewith.

"WALTER L. FLOWER & Co.,
"December 20, 1901.            WALTER L. FLOWER."

Plaintiff alleged the performance of the contract on his part by the successful prosecution of a test case before the board of United States general appraisers, sitting at the city of New York, on the protest of William Larzelere & Co., the refunding by the United States to plaintiff of $962.67, on account of overpayments by the defendant of duties on importations of iron and copper flexible tubing, and the refusal of defendant to pay plaintiff one-half of said $962.67, as agreed upon.

The answer was a general denial. At the trial, defendant objected to the introduction of any evidence for the following reasons:

"1. Because the contract sued on shows, on the face of the pleadings, that an attempt is being made to enforce a contract infected with champerty.

"2. Because the contract sued on shows on its face and the face of the pleadings that the contract related to future importations of copper tubing, while damages

were claimed on importations made long prior to the date of the contract, on both copper and iron tubing.

"3. That the alleged prosecution of an alleged test case pleaded in the answer was not within the terms of the contract."

These objections were overruled.

Walter L. Flower, by deposition, testified for plaintiff as follows:

"During the summer of 1900 we imported from England, purchased from the United Flexible Metallic Tubing Company, Limited, flexible metallic tubing. The importations were made through the customs brokers, Charles H. Wyman & Co., who attended to business in connection with such importations such as making entries, payment of duties, making of protests and everything pertaining to them. I do not know anything about the names of the steamers or dates. Some refunds were made through C. H. Wyman & Co., but can't state the amounts."

Thomas W. Mabrey, testified, in substance, as follows:

"I am connected with the office of surveyor of the port—have been for about eleven years. I am liquidating clerk. The duties of this department are to calculate the duties, and where importers are notified of the amount due on their importations. I figured the amount of government charges on all importations by use of invoice. In case of a dispute as to the amount to be paid, we go to the treasury decisions, if any, to the board of appraisers, and instructions of the department—we use our own judgment, and if there are two rates applicable we always collect the highest rates.

"We select the paragraph which in our opinion covers the particular importations. If the importer differs from us as to the particular paragraph the importation comes under, the tariff law itself provides he may have the right of protesting, and an appeal to the board of general appraisers in New York within ten

days after the time of liquidation, by which is meant the final calculation of the duties which the importer owes the government. The importer must pay the duties before the protest is forwarded to the board of appraisers. After the amount is calculated the importer pays the duty whether he objects or not. The protest goes to the board of appraisers at New York; they take it up in due course and hear and decide it. After they have decided it a copy of their decision comes to our office and is turned over to me, and at the end of thirty days in the absence of an appeal, on the part of the government, I take it up and make a refund certificate. We reliquidate it or figure the duty over again. This is done when the board of appraisers says the original liquidation was too high, and I reliquidate at figures which they say is right.

"On the reliquidation, a refund certificate is made and given to the importer for the amount overpaid. The importer then makes affidavit to the certificate and it is then forwarded to the department at Washington and in the course of two or three weeks a check comes back to the importer or broker through us for the refund, to whom it is delivered and receipt taken. I have here record books from my office of importations by steamer Sagamore, July 11, 1900, of metallic tubing to Walter L. Flower & Co., from the United Flexible Metallic Tubing Co. This importation covered other articles than flexible metallic tubing. It had galvanized iron tubes on it also. Entry was made in name of Charles H. Wyman & Co., for Walter L. Flower & Co. Our number is 58. There was filed in our office the invoice covering the shipment and a paper called the 'entry' signed by Charles H. Wyman & Co. The original basis of charge was 45 per cent ad valorem, on which basis I liquidated it. Ad valorem means so much on each dollar's worth. It was liquidated at this rate because we thought this rate applicable to this class of merchandise. Duties were paid. Protest was filed by Chas. H. Wy-

man & Co. and forwarded to the board of appraisers in New York on August 9, 1900. We next heard from the protest about May 24, 1902; the original decision bears a stamp date of May 22, 1902.

"Thirty or fifty days after the receipt of the opinion it was reliquidated—that is I refigured the amount of duty under the rate fixed by the board of general appraisers, which was thirty-five per cent on the iron tubes and two and one-half per cent per pound on the tubes made of copper, and showed that the importer had overpaid $910.52, for which amount a refund certificate was made and forwarded to the department, for which we got back a check, for which we have Mr. Wyman's receipt.

"The original opinion was sent by the general board of appraisers in New York to the surveyor of customs and received in due course of mail, which opinion is quoted below:

"Opinion by Fisher, G. A., at New York, May 22, 1902, in protest No. 46066-B 3657, of Charles H. Wyman & Co., against decision of surveyor of customs at St. Louis, as to the rate and amount of duties chargeable on certain merchandise imported per steamer Sagamore, July 11, 1900. 'The merchandise consists of flexible tubing of the kind passed upon by this board in G. A. 5080, following which we sustain the claim that the copper tubing is dutiable under paragraph 176 of the act of July 24, 1897, at the rate of two and one-half cents per pound, and that the iron and steel tubing is dutiable under paragraph 152 at the rate of 35 per cent ad valorem.'

"The protest No. 3651 is our protest number. The document I have just read is the ruling of the board of general appraisers of New York, and refers to this particular protest. Mr. Gallenkamp is the surveyor of customs at St. Louis.

"Charles H. Wyman & Co. were the importers for account of Walter L. Flower & Co. of the entry No. 427,

made on August 23, 1900. Purchase was made from the same company as other invoice, covered copper tubing. This entry took same course as the other.''

The opinion above referred to is numbered 46851-B 3687, was read in evidence and is substantially like the the decision in the other case. Witness, resuming, said these two decisions were kept in the files of the office of the surveyor of customs.

''It is on these two decisions that I acted in making up the refund and which are part of the records in my office. I acted on the decision on October 15, 1902, reliquidated the entry and made up a refund certificate for $52.25 due the importer. It was forwarded to department, check was returned and delivered to Chas. H. Wyman & Co., November 21, 1902, who receipted for it. The date of the protest on this entry was September 7, 1900.''

On cross-examination witness said the United States examiner reports on the character of the goods and, ''I fix the rate of duty chargeable and amount collected. As a rule the hearings on protests filed are had in New York, but hearings may be had here at the request of the party filing protest. In one of these cases a hearing was requested on the protest in St. Louis, that is in No. 58, the first of the two protests. Either party has thirty days within which to appeal, and if the importer appeals from the decision he files his appeal in court and gives the surveyor notice. It is filed as an original proceeding in the United States court.''

On re-direct examination witness testified that request for hearing in St. Louis was on the protest when filed, on July 27, 1900.

Plaintiff next read the following from the deposition of Phillip Comstock, who resided in New York City, at which place the deposition was taken: ''I am manager of the plaintiff's office, and have charge of the correspondence. I know the firm of Walter L. Flower & Co., and have had correspondence with them about

this matter. I wrote the letter of December 13, 1901. I enclosed with it a blank copy of the contract, and received the reply dated December 20, 1901. ''We asked plaintiff several times by mail to remit when refunds were received, but they did not remit. It was acting on the information received from Mr. Ansell as to whom the importers were that led us to write to plaintiff. We first learned of Mr. Wyman's connection with these protests about June 10, 1902.''

Plaintiff's letter of June 11, 1902, was now read in evidence:

''I note the allowance by the board of appraisers on the twenty-second ult., pursuant to my successful prosecution of the issue of a protest made for your interest, but in the name of Charles H. Wyman & Co., as to the duty exacted on flexible tubes of iron and copper. As this protest is within the terms of our contract, and as the sustaining of it results directly from the steps I have taken pursuant to the said contract, and others similarly worded from other claimants, I beg you will remit to me one-half the amount which shall be recovered thereunder, whenever you receive the same from the government.''

Defendant replied to the above letter as follows:

''Answering your esteemed favor of the eleventh, delay due to the writer's absence from the city, beg to say that up to this writing we have not received one cent on account of excess duty paid to the government. As we understand the contract between us, you are to return to us one-half the amount you are instrumental in recovering from the government, or, in the event the whole matter thus obtained being paid to us, we are to remit to you half of it. Is this correct?''

Plaintiff introduced in evidence a letter from plaintiff to defendant dated June 18, 1902, which is as follows:

''Your favor of the 16th inst. is duly received regarding the question of refund on flexible tubing, and

your understanding of our contract relations is quite correct. The protest in question, however, having been allowed by the board of appraisers, the entry will be returned to the collector of your port for reliquidation, and when that process has been completed the check or government warrant will be drawn to the order of Messrs. C. H. Wyman & Co., in whose name the entry was made, who will, I presume, forward their check for the same amount to you, upon which I shall be glad to have you send me one-half of the amount. The protest in question was upon entry No. 58 per Sagamore, July 11, 1900, and the allowance was made by the board of appraisers on the twenty-second of May, following similar allowances of protest filed and prosecuted by me."

J. F. Strauss, by deposition, testified as follows:

"I am clerk in the office of Albert Comstock for attending to the trial of cases and expedition of business before the board of United States general appraisers, and relating to either the valuation of classification of merchandise entered into the United States from foreign countries, and I knew that flexible metallic tubing has been the subject of importations. Among those known to be importers of this material are William Larzelere & Co., Pitt & Scott and Charles H. Wyman & Co. I know that this material was in 1900 classified by the collector as manufactures of metals under paragraph 193 of the Act of July 24, 1897, as a manufacture of metal not otherwise provided, at 45 per cent ad valorem.

"Q. Who presented the case of Pitt & Scott and William Larzelere & Co. before the board of appraisers? A. I did. Some of the protests were made by the plaintiff, others were made by the principals prior to having retained the plaintiff. I presented the issue before the board; two claims were made for the importers, one that some of the merchandise was dutiable at 35 per cent ad valorem under paragraph 152, and that other of the merchandise was dutiable at two and one-

half cents per pound under paragraph 176 of the Act of July 24, 1897, according to the material composing the tubes. I conducted the examination of the witnesses myself in the two cases. That case was decided by the board favorable to the contentions made in the protests. The decision in the Larzelere case was published G. A. 5080. I am familiar with the case reported in T. D. 22413, G. A. 4742, decided by the board August 6, 1900. That decision referred to the same kind of merchandise as that covered by G. A. 5080. The decision in this case overruled the protest and affirmed the decision of the collector assessing a duty of 45 per cent.

"I know that Chas. H. Wyman & Co. made importations of flexible metallic tubing on July 11th and August 22, 1900. I have seen the protests. I did not see the invoices. The protests filed by Wyman were decided by the board of United States general appraisers on May 22, 1902, and August 20, 1902, and both were sustained. In the two cases of Pitt & Scott and Larzelere & Co., information was placed before the board of appraisers relating to the method of the manufacture of the tubes together with knowledge of the materials of which they were composed.

"Q. Do you know whether evidence of that character had been introduced at the earlier case, or not? A. There had not.

"Q. Do you know whether the case referred to in the opinion by the board sustaining the protests on the two entries in the name of Wyman & Co. has reference to the case known as G. A. 5080 referred to in that opinion? A. G. A. 5080 referred to in the two opinions on the Wyman protests is the opinion in the case that I tried before the board of general appraisers. The United States did not appeal from any of those decisions."

Plaintiff's counsel next read in evidence the deposition of plaintiff, taken and filed in the case, which is as follows:

"I have been practicing law for eighteen years; have made a specialty of customs and revenue cases, with which I am especially familiar; have had dealings with Flower & Co. of St. Louis, by correspondence and their sending me a contract. In the first instance the appeals from the classification by the collector come before the board of United States general appraisers. In the event an appeal is taken from the board it is taken to the United States circuit court in the district within which the importations are made.

"Q. Did you take any steps on behalf of any importers to secure a reversal of the decision T. D. 22413-G. A. 4742, and a decision favorable to the importers? A. Literally, of that decision, no, but I secured a decision of the same tribunal of an apposite tenor, overruling it in effect; such steps were taken for Wm. Larzelere & Co., the Anglo-American Flexible Metallic Tubing Co., and Flower & Co., also Pitt & Scott. Mr. Strauss, who attended to the matters, is one of my clerks, and took the steps under general and broad instructions from me. The decision G. A. 5080 T. D. 23522, in the board's decision in the test case made before the board by Mr. Strauss under my directions, on flexible metallic tubing."

Defendant's counsel moved to strike out so much of the answer as describes the case as a test case, on the ground that it states a conclusion, which objection was overruled and exceptions saved.

Continuing, witness testified as follows:

"The treasury department accepted the decision in G. A. 5080 as conclusive. Flower & Co. had protests before the board at the time of the decision. Others of them had not arrived at the time. The Flower protests were undecided at this time.

"Q. Were any proceedings had by you in court in behalf of Flower & Co. in prosecuting this issue as to the duty on flexible tubing? A. No, nor did I expect

when we made the contract that any would be necessary.''

On cross-examination witness further testified:

''What I have called the test case was taken up by this office and prosecuted before the board under and pursuant to a series of contracts of the same purport as the one with Flower & Co., and distinctly in consideration of such contracts. The first thing I did specifically for defendant in relation to sustaining their protests, was the trial of the test case before the board of appraisers for Larzelere & Co. done alike for the benefit of all my clients with like claims. The next thing was to move some of their protests for favorable decision. I think this is all the service I rendered for defendant.''

Witness declined to state in detail what services he rendered in reference to the presentation of their protests before the board, but said it required no great labor.

'Whatever services were rendered were attended to by my clerks. I cannot say that any obstructions had to be overcome, nor that there were different presentations of the matter to the board in Flower's case. I understand that defendant's protests were filed prior to the presentation of the Larzelere case. Nobody had been prosecuting defendant's protests. After the decision in the Larzelere case I performed no service for defendants. Larzelere & Co. paid me for my services the same proportional amount as I expect from Flower & Co. I gave the defendant no information as to my method of procedure beyond what will be found in my letters and the contract signed by him.''

Plaintiff's evidence shows that the first decision by the board of general appraisers was on a protest coming from San Francisco in which the board ruled as follows:

''From the testimony and samples before us we find that the articles are not made of iron, steel or cop-

per, but are made of composition metal manufactured under a patented process, and hold that they are dutiable manufactures as chief value of metal as assessed."

The board further held, that in order to make the flexible tubing come under the paragraph providing a duty of 35 per cent ad valorem, or that providing a duty of two and one-half cents per pound, "it is essential that the tubes or pipes shall be made of copper or iron respectively."

Plaintiff also showed that he had a test case on the protest of Larzelere & Co. v. Collector of Customs at Philadelphia, Pa., which he presented before the board of appraisers in New York, resulting in the reversal of the opinion in the San Francisco case and holding, in the light of new evidence produced by plaintiff, that the copper pipes were made wholly of copper and the iron pipes wholly of iron. Plaintiff also showed that the two protests filed for defendant, by C. H. Wyman & Co., had been pending for a year and one-half and nothing whatever had been done to bring them to a hearing until after the decision in the test case, when they were taken up by Strauss, a clerk in plaintiff's office, and decisions secured thereon by the board.

Defendant on his own behalf testified that at the time he received plaintiff's letter of December 13, 1901, two protests had been filed in his interest in which he was represented by C. H. Wyman & Co. of St. Louis; that he never made any arrangement with plaintiff that he represent these protests and that he had no protests other than these two, and plaintiff never called on him at any time, subsequent to the making of the contract, to furnish data for filing protests, nor did he (plaintiff) at any time inform him of what was being done before the general board.

C. H. Wyman testified that his occupation was custom house attorney and broker at St. Louis, and that his firm filed two protests for the defendant and made re-

quests for a hearing in St. Louis; that he did not know plaintiff was employed by defendant in the so-called test case.

The jury found a verdict for plaintiff in the sum of $521.05. Defendant filed motions for new trial and in arrest, and in support of his motion for new trial filed the affidavit of C. E. Larzelere which contradicts the evidence of plaintiff to the effect that the Larzelere & Co. case, prosecuted before the general board by plaintiff, was a test case. This affidavit is unavailing for the reason the newly-discovered evidence is not a ground alleged in the motion for new trial.

BLAND, P. J. (after stating the facts).—1. Defendant strenuously contends that the following clause in the contract shows it to be champertous, to-wit: "But we are not to be liable hereunder for any expenses which may be incurred by said Albert Comstock in pursuance of this agreement, nor for any sums whatever, except in the event of a recovery as stated above, then only to the extent above named." This clause of the contract should be interpreted by what the parties had in contemplation at the time, to-wit, the prosecution of protests against what was claimed to be excessive levies of import duties on importations of flexible metallic tubing by the defendant. As shown by plaintiff's letter of December 13, 1901, he expressed himself hopeful of securing a favorable ruling from the general board of appraisers, but if not, then he agreed to prosecute the protests to a decision in the Federal courts at his own expense. The accrual of costs is a necessary incident to the prosecution of any suit in the courts. This cost is usually taxed to the losing party, and this contract, in the light of the letter of December 13th, must be construed as obliging plaintiff to pay all costs that might accrue, in the prosecution of an appeal from the board to the United States courts, and be taxed against the defendant and other parties who had made similar con-

tracts with plaintiff and who should be made parties to the court proceeding. In this State, an agreement by an attorney to pay all or some portion of the court costs to accrue in a suit, which he is employed to prosecute, is champertous. [Duke v. Harper, 66 Mo. 51.] But the answer is a general denial. Under this plea, the defense that the contract was voidable for the reason it was champertous, is not available. Champerty is an affirmative defense and if the defendant would avail himself of it he should have set it forth in his answer. [Moore v. Ringo, 82 Mo. 468; Pike v. Martindale, 91 Mo. 268, 1 S. W. 858; Bick v. Overfelt, 88 Mo. App. 143.]

2. It is contended that the contract embraced only protests to be filed in the future, that is, protests filed after the execution of the contract and hence the protests, on which the $962.67 was refunded, having been made long prior to the date of the contract, are not covered by it. The language of the contract is, "We (defendant), the undersigned, hereby respectively retain said Albert Comstock as our attorney and authorize him to act as our attorney and agent for the recovery and collection of excessive customs duties charged on all flexible metallic tubing made by us for our respective interests." Further on the instrument reads as follows: "We (defendant) also agree to give said Albert Comstock timely and sufficient notice of each importation, and of all official transactions connected therewith." These two clauses of the contract indicate that excessive duties on all importations theretofore paid or that might be paid in the future were intended to be included in the contract. But the following clause in plaintiff's letter of December 13, 1901, shows that plaintiff was not aware that defendant had any protest on file at the time and that he had in contemplation the making of a contract in respect to protests to be filed in the future: "If you have any entries of these goods which are not yet liquidated, or which have been liquidated within a few days, or if you expect to make any entries, I shall be

glad to have you sign the enclosed contract covering the issue, and at the same time to send me immediate notice of any such entries. If you have lodged any protests yourself, I will arrange to control them in your behalf.'' In his answer to the letter of December 13th, defendant made no reference to his protest then on file, informing the plaintiff that he had no entries in the custom house and had not had for a few days past but would advise plaintiff of those that came along in the future. We think these lettters show that the protests defendant then had on file were not in the mind of either party at the time the contract was signed; but this fact does not necessarily take them outside the boundaries of the contract, in view of the fact that the formal contract covers all protests, and in the light of the evidence that after the test case of Larzelere & Co. had been heard and a favorable opinion rendered thereon by the board of appraisers, the two protests of the defendant made in the name of Wyman & Co. were taken up by Strauss, a clerk in plaintiff's office, and presented to the board of appraisers and favorable decisions rendered thereon, one on May 22nd, and the other on August 20, 1902, copies of which were sent to' and received by the collector of customs at St. Louis, who then reliquidated the impost duties and made out refund certificates to Wyman & Co., on which the $962.67 was collected and paid to defendant; and in the light of defendant's letters, one in answer to plaintiff's letter of June 11, 1902, and the other dated June 18, 1902, in which he not only recognized the fact that these two protests were embraced in the contract but acknowledged that plaintiff had rendered the services he agreed to render under the contract and had earned his commission. These letters went further and authorized plaintiff to take out his commission if the refund money should first come into his hands and promised if the money should come to defendant, he would promptly remit one-half of the amount to plaintiff in payment of his commission.

Whatever ambiguity or uncertainty, therefore, there may be in the language of the contract in respect to these two protests, as interpreted by the letters, is cleared up by this correspondence, and it is made absolutely certain that both plaintiff and defendant did understand that they were embraced in the contract, and that plaintiff was entitled to his commission as per contract. The defense is made up of a number of technical but unmeritorious objections to the evidence plaintiff offered, and of a strained construction of the contract. The record, taken as a whole, shows beyond the shadow of a doubt that plaintiff earned the commission he sued for, that defendant acknowledged he had earned it and promised to pay it. The judgment holds him to his promise and is affirmed. All concur.